IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

CHRISTY M. BREWER,

     Plaintiff,

v.                             CIVIL ACTION NO. 5:11-0467

MOUNTAIN STATE UNIVERSITY, INC.,

     Defendant.

## COMPLAINT

### PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Christy M. Brewer ("Brewer" or "the Plaintiff") is a citizen and resident of Cape Charles, Northampton County, Virginia.

2. Defendant Mountain State University, Inc. ("Mountain State" or "the Defendant") is a corporation incorporated in and with its principal place of business in Beckley, Raleigh County, West Virginia.

3. This Court has jurisdiction of this action under 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000.

4. Venue is proper with this Court under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to Brewer's claims occurred in this district.

## FACTS

5.    Mountain State is a private university with campuses located in West
Virginia, Pennsylvania, North Carolina, Florida, and Washington, D.C.,
and offers undergraduate and graduate degree  programs in several
majors, including a nurse anesthesia program (although, according to a
message on Mountain State's website from Roslyn Artis, Ed.D, who is
identified as Mountain State's chief academic officer, Mountain State is
closing its nurse anesthesia program effective October 16, 2011, but the
program will remain in full compliance with the Council on Accreditation
of Nurse Anesthesia Programs (COA) and will maintain its accreditation
until that date.)

6.    In December 2006, Brewer, who had already obtained several
degrees, including a B.S.N. and had worked as a registered nurse, was
accepted into Mountain State's graduate nurse anesthesia program, which
was directed at that time by Wayne Ellis, Ph.D., who was at all times
an employee and agent of Mountain State.

7.    Brewer began classes in the spring semester of 2007, which started in
January 2007. However, Brewer completed her classes for that
semester and for the following summer semester without ever
receiving a syllabus for any of her courses, despite the clear and

unambiguous requirement in MSU's Faculty and Staff Handbook that an instructor provide a course syllabus on the first day of class. When she asked Ellis about his failure to provide a syllabus, he assured her that she was "doing just fine" and that she "shouldn't worry" about her performance -- although some of her classmates had reason to be worried.

8.     When Brewer began the fall semester in 2007, she specifically requested copies of the syllabi for her courses, but her request was denied. Similarly, when she asked Ellis on three separate occasions throughout the semester to see her grades, he refused to allow her to see them. Consequently, Brewer finished the semester on December 7, 2007 without having been permitted to see any of her course work or exam grades.

9.     On December 10, 2007, Brewer was told by Melody Tilley, the Program Secretary, to meet with Ellis on December 12 and to bring her thesis research with her.

10.    When Brewer met with Ellis on December 12, accompanied by her husband, Ellis informed her that she had failed a pharmacology course (Pharmacology 542) by 0.2% points. This was Brewer's first knowledge that she had failed the course, even though Mountain State's Nurse Anesthesia Student Handbook requires that any student who is in danger of failing a course is to be informed of his/her risk of failure and then

3

offered assistance through a special committee. When Brewer asked to see the five exams she had taken over the course of the semester, Ellis refused to show her the exams. Ellis did tell her that he and Brewer could "make a deal" and that he would let her take the final exam again. Ellis gave Brewer three packets of papers, which he explained contained the final exam questions, and told her to come back in two weeks and take the final exam again. Ellis told Brewer that this option -- to retake the final exam -- was not being offered to any other student.

11. The following day, December 13, 2007, Brewer wrote to Ellis and told him that she would not agree to retake the final exam and renewed her request that she be given access to the course syllabi and her exams for the pharmacology class.

12. On January 4, 2008, before the start of the spring semester, Brewer received in the mail four withdrawal forms signed by Ellis for the courses she had taken during the September 2007 semester. In a clear and unambiguous violation of Mountain State policy, Ellis had withdrawn Brewer from all of her courses -- without her permission -- including the ones that, without question, she had passed.

13. In fact, Mountain State's policy provided that only a student could withdraw himself or herself from a class. When Brewer attempted to

4

appeal Ellis' improper withdrawal of her from her classes, she was unable to do so. But in June 2008, several months after Ellis had withdrawn her from her classes, she received grades for the three courses other than Pharmacology 542. Those grades reflected that she had passed the three courses other than Pharmacology 542.

14.    When Mountain State produced Brewer's exams for the Pharmacology 542 course, Brewer saw that Ellis had recorded grades for six exams, rather than five, which had caused Brewer to fail the course. However, when Brewer reviewed the six exams, she saw that the sixth exam was clearly labeled as being for another course -- not Pharmacology 542 -- and therefore should not have been included in calculating her grade for Pharmacology 542.

15    This obvious and avoidable error resulted in Brewer failing Pharmacology 542. Had Ellis counted the five exams that pertained only to Pharmacology 542, as he should have, Brewer would have passed the course.

16.    As a result of apparently failing Pharmacology 542, which was due solely to Ellis' error, Brewer had to drop back to the next cohort in order to remain in Mountain State's nurse anesthesia program while she waited to join Cohort 4, as classes are offered in sequence and according to a

schedule, based on Mountain State's four-semesters-per year schedule: Fall, Spring, Summer I, and Summer II, all of which were mandatory for the nurse anesthesia program. Due to Ellis' -- and thus Mountain State's -- error, not only would Brewer graduate a full year later than she should have, but she would have to take -- and pay for -- additional classes in order to do so.

17.    To make matters even worse, the additional classes that Brewer had to take were again under Ellis' direction. As with her earlier experience with Ellis and contrary to Mountain State's stated policy, Brewer was not provided with syllabi for the courses and was denied access to her grades.

18.    On or around May 8, 2008, Brewer met with Patsy Haslam, who was Dean of Students, and Jon Reed, Esquire, counsel for Mountain State, who attended the meeting at Haslam's request. Brewer was also accompanied by her husband. During this meeting, Haslam assured Brewer that she was fully aware of the problems with the graduate nurse anesthesia program. Haslam told Brewer that she personally was investigating the program and that she "had a plan," which she reiterated in a subsequent email to Brewer. Haslam also informed Brewer that if Brewer continued to ask for course syllabi and her grades, she was making the situation more difficult for herself, although Haslam did not elaborate on her warning.

6

Unfortunately, Haslam failed to tell Brewer that she was retiring in June 2008. During the meeting, Brewer provided Haslam with the three packets of exam questions that Ellis had given to her for her final exam and expressed her concern about the ethical considerations presented by Ellis' "deal."

19.    On June 28, 2008, students in the graduate nurse anesthesia program, including Brewer, were required to attend a meeting with the Council on Accreditation of Nurse Anesthesia Programs (COA). The students, including Brewer, had been told that any student speaking up at the meeting would be disciplined and would not graduate. Following that meeting, in February 2009, the COA placed Mountain State's graduate nurse anesthesia program on probation, based on the program's numerous violations of the COA's regulations.

20.    In August 2008, Ellis left Mountain State under circumstances that are not clear. However, on August 17, Brewer had provided to Jessica Sharp, Director of the Nurse Practitioner Program, a copy of a lecture that Ellis had given to Cohorts 3 and 4 in which he had described, in loud and inappropriate language, his interaction with a student that Brewer believed was her, which caused Brewer to feel humiliated and embarrassed. Brewer had started in Cohort 3, but had to drop back to

Cohort 4 as a result of the failing grade in Pharmacology 542 that she received incorrectly and inappropriately from Ellis, which meant that Brewer's fellow students in Cohorts 3 and 4 heard Ellis describe a student whom they could identify as Brewer in demeaning and unflattering terms.

21.    Ron Smith succeeded Ellis as program director, but the bizarre behavior that Mountain State's faculty exhibited did not change. On or around March 17 and 18, 2009, Smith, who acted at all times as an employee and agent of Mountain State, gave a Power Point presentation to his class of 13 students, including Brewer, at which time, believing that the class members previously had attended a meeting with lawyers about their potential claims against Mountain State and him, Smith told the class that he "hated" them and "wanted to kill all of" them and that "any student seeking legal advice would never graduate." Present for the lecture on March 18 were Roslyn Artis, then Mountain State's counsel, and now its chief academic officer; Cindy Thompson, the clinical coordinator; Melody Tilley, the program secretary; and Rebekah Carmel, a faculty member who would become Mountain State program director. On March 23, 2009, Mountain State relieved Smith of his duties as program director.

22.    As part of the program, Brewer attended hospital clinicals between June 2009 and July 2010. Ellis, on behalf of Mountain State, had repeatedly

8

promised students that they would be able to attend hospital clinicals within a 50-mile radius of their home. However, Mountain State assigned Brewer, who lived in Charleston, West Virginia, clinicals for two months in Harlan, Kentucky (196 miles from Charleston); for three months in Lexington, Kentucky (175 miles from Charleston); for two months in Huntington, West Virginia (48 miles from Charleston); for one month in Cumberland, Maryland (227 miles from Charleston); for one month in Hazard, Kentucky (169 miles from Charleston); and for one month in Beckley, West Virginia (59 miles from Charleston). Brewer was the only female in Cohort 4 who was assigned such extensive travel to her clinicals, which represented an effort by Mountain State to burden and oppress her so that she would leave the program.

23.   Upon receiving these assignments, Brewer went to Cindy Thompson, the clinical coordinator, and explained that she could not afford to provide housing for herself at any of these locations. Thompson informed Brewer that if she could not provide her own housing and attend clinicals, she would be permitted "to withdraw from the program." Because withdrawing from the program was not an option -- if for no other reason than the fact that Brewer, through no fault of her own, was already a year behind in her degree program and therefore one year behind in earning a

salary and accruing benefits as a CRNA -- she purchased a used 25-square-foot travel trailer, then towed it to RV campgrounds, and thus managed to attend her clinicals, albeit at considerable expense and inconvenience to herself.

24.   Also, during Brewer's four semesters of clinicals, Mountain State charged her a per-semester clinical fee of $4,000, in addition to tuition and other fees. Mountain State did not inform Brewer in advance about these clinical fees, nor did Mountain State obtain her agreement in advance to pay them. Then, even though the first clinical semester was scheduled to begin in March, it did not begin until June 29. Nevertheless, Mountain State charged the full clinical fee for the abbreviated semester and did not pro-rate or adjust the fee.

25.   Further, it is not clear why Mountain State charged Brewer, and presumably other students, the clinical fee in the first place. Mountain State did not pay its clinical instructors, it did not pay any hospitals, it did not provide any equipment, and it did not provide any housing or transportation for its students. Thus, the clinical fee was created and existed only to provide more profit for Mountain State. The clinical fee was also cited by the COA as inappropriate and was one of the reasons Mountain State was placed on probation.

26.    In March 2010, Brewer learned that a hooding ceremony in May 2010 was required for  graduation, and was informed by Rebekah Carmel that her not attending would result in her not graduating, and thus was more expense that  Brewer incurred, which benefited Mountain State.

27.    In July 2010, Brewer graduated from Mountain State with her master's degree in nurse anesthesia. Because she did not anticipate returning to West Virginia following her graduation and because she had signed a contract of employment with the University of Tennessee Medical Center ("UTMC") and planned to begin its Ph.D. program, she submitted a transcript request form at the registrar's office on July 15, and asked that her official transcript with her final grades and degree confirmation be mailed to UTMC, which she understood would take at least three weeks.

28.    On July 16, Brewer reviewed her grades online, and saw that she had received an "F" (failing grade) for a course she took in the summer of 2008 that had been taught by Wayne Ellis, but from which she withdrew at the direction of Ron Smith because Ellis had left Mountain State, and Mountain State had no one else available to teach the course. Brewer understood that she would receive a "WP" (withdrawal) for the course, which she was passing when Smith instructed her to withdraw. Brewer

had printed out the documentation that reflected she received a WP for the course.

29.     Brewer immediately contacted Melody Tilley and Rebekah Carmel and informed them about the error and asked that they correct it immediately, and understood that the "F" would be changed to a "W," to reflect correctly that Brewer had withdrawn from the course (at Smith's direction), not failed it. Brewer was still understandably concerned that the transcript reflecting the "F" would be sent to UTMC.

30.     In late July, Brewer learned that her fears were justified when UTMC notified her that it had received her official transcript, which reflected that she had received an "F" for the course, rather than the "W" she actually received.

31.     At that point, Brewer contacted the president's office at Mountain State and demanded that Mountain State correct the mistake, but Mountain State did not do so in time to enable Brewer to salvage her position with UTMC, which withdrew its offer of employment to Brewer and thereby rendered her unable to begin its Ph.D. program.

32.     Brewer passed her boards in October 2010 and has been gainfully employed since that time.

## COUNT I
## BREACH OF CONTRACT

33.   Brewer incorporates by reference hereto paragraphs 1 through 32 as if set forth verbatim hereinafter.

34.   Mountain State agreed to provide Brewer with an education in her chosen degree program in exchange for Brewer's satisfactory completion of the requirements of that degree program.

35.   Mountain State's agreement with Brewer constituted a contract.

36.   Mountain State's actions and/or actions, including, but not limited to, Wayne Ellis' falsification and/or fabrication of Brewer's failing grade for the Pharmacology 542 course, which required Brewer to take courses for an additional year and incur substantial additional expense; its denial of her appeal rights regarding her allegedly failing grade in Pharmacology 542, which she was guaranteed under Mountain State's Student Handbook; Ellis' decision to withdraw Brewer from an entire's semester's worth of courses, including several that she had passed; and the falsification and/or fabrication of Brewer's official transcript so that it appeared that Brewer had failed a class from which she had actually been forced to withdraw, represented a breach of the parties' contract.

37.   As a direct and proximate result of Mountain State's breach of the parties' contract, Brewer has sustained various damages.

## COUNT II
## BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

38.     Brewer incorporates by reference hereto paragraphs 1 through 37 as if set forth verbatim hereinafter.

39.     Mountain State had a duty to act in good faith and to deal fairly with Brewer regarding the contract between them.

40.     Mountain State's actions and/or actions, including, but not limited to, Wayne Ellis' falsification and/or fabrication of Brewer's failing grade for the Pharmacology 542 course, which required Brewer to take courses for an additional year and incur substantial additional expense; its denial of her appeal rights regarding her allegedly failing grade in Pharmacology 542, which she was guaranteed under Mountain State's Student Handbook; Ellis' decision to withdraw Brewer from an entire semester's worth of courses, including several that she had passed; and the falsification and/or fabrication of Brewer's official transcript so that it appeared that Brewer had failed a class from which she had actually been forced to withdraw, represented a breach of Mountain State's duty of good faith and fair dealing.

41.     As a direct and proximate result of Mountain State's breach of its duty to act in good faith and to deal fairly with Brewer regarding the contract between them, Brewer has sustained various damages.

14

## COUNT III
## FRAUD

42.    Brewer incorporates by reference hereto paragraphs 1 through 41 as if set forth verbatim hereinafter.

43.    Mountain State's actions and/or actions, including, but not limited to, Wayne Ellis' falsification and/or fabrication of Brewer's failing grade for the Pharmacology 542 course, which required Brewer to take courses for an additional year and incur substantial additional expense; its denial of her appeal rights regarding her allegedly failing grade in Pharmacology 542, which she was guaranteed under Mountain State's Student Handbook; Ellis' decision to withdraw Brewer from an entire semester's worth of courses, including several that she had passed; and the falsification and/or fabrication of Brewer's official transcript so that it appeared that Brewer had failed a class from which she had actually been forced to withdraw, represented fraudulent conduct by Mountain State.

44.    Mountain State engaged in and committed fraud against Brewer.

45.    As a direct and proximate result of Mountain State's fraudulent conduct, Brewer has sustained various damages.

**COUNT IV**
**NEGLIGENCE**

46.     Brewer incorporates by reference hereto paragraphs 1 through 45 as if set forth verbatim hereinafter.

47.     Mountain State owed a duty to Brewer to provide her with an education in her chosen degree program in exchange for Brewer's satisfactory completion of the requirements of that degree program.

48.     Mountain State owed a duty to Brewer to treat her in the same manner as any other similarly situated student.

49.     Mountain State's actions and/or actions, including, but not limited to, Wayne Ellis' falsification and/or fabrication of Brewer's failing grade for the Pharmacology 542 course, which required Brewer to take courses for an additional year and incur substantial additional expense; its denial of her appeal rights regarding her allegedly failing grade in Pharmacology 542, which she was guaranteed under Mountain State's Student Handbook; Ellis' decision to withdraw Brewer from an entire's semester's worth of courses, including several that she had passed; and the falsification and/or fabrication of Brewer's official transcript so that it appeared that Brewer had failed a class from which she had actually been forced to withdraw, represented breaches of Mountain State's duties to Brewer.

16

50.    As a direct and proximate result of Mountain State's breach of its duties,
       Brewer has sustained various damages.


## COUNT V
## INTENTIONAL MISREPRESENTATIONS

51.    Brewer incorporates by reference hereto paragraphs 1 through 50 as if set
       forth verbatim hereinafter.

52.    Mountain State intentionally misrepresented information to Brewer,
       including, but not limited to, her apparently failing grade in
       Pharmacology 542, which required Brewer to take courses for an
       additional year and incur substantial additional expense; its denial of her
       appeal rights regarding her allegedly failing grade in Pharmacology 542,
       which she was guaranteed under Mountain State's Student Handbook;
       Ellis' decision to withdraw Brewer from an entire's semester's worth of
       courses, including several that she had passed; and the falsification
       and/or fabrication of Brewer's official transcript so that it appeared that
       Brewer had failed a class from which she had actually been forced to
       withdraw.

53.    Brewer reasonably relied on Mountain State's intentional
       misrepresentations, which had the effect of, among other things, delaying
       by one year her graduation from Mountain State, requiring her to incur

substantial and unnecessary additional expenses, and losing employment and an opportunity to further her education at UTMC.

54.    As a direct and proximate result of Brewer's reasonable reliance on Mountain State's intentional misrepresentations, Brewer has sustained various damages.


## COUNT VI
## NEGLIGENT MISREPRESENTATIONS

55.    Brewer incorporates by reference hereto paragraphs 1 through 54 as if set forth verbatim hereinafter.

56.    Mountain State negligently misrepresented information to Brewer, including, but not limited to, her apparently failing grade in Pharmacology 542, which required Brewer to take courses for an additional year and incur substantial additional expense; its denial of her appeal rights regarding her allegedly failing grade in Pharmacology 542, which she was guaranteed under Mountain State's Student Handbook; Ellis' decision to withdraw Brewer from an entire's semester's worth of courses, including several that she had passed; and the falsification and/or fabrication of Brewer's official transcript so that it appeared that Brewer had failed a class from which she had actually been forced to withdraw.

57.   Brewer reasonably relied on Mountain State's negligent misrepresentations, which had the effect of, among other things, delaying by one year her graduation from Mountain State, requiring her to incur substantial and unnecessary additional expenses, and losing employment and an opportunity to further her education at UTMC.

58.   As a direct and proximate result of Brewer's reasonable reliance on Mountain State's negligent misrepresentations, Brewer has sustained various damages.

**COUNT VII**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

59.   Brewer incorporates by reference hereto paragraphs 1 through 58 as if set forth verbatim hereinafter.

60.   Mountain State owed a duty to Brewer to avoid inflicting emotional distress upon her.

61.   Mountain State's conduct was atrocious, intolerable, and so extreme as to exceed the bounds of decency, and was undertaken with the intent to inflict severe emotional distress upon Brewer, or was undertaken with reckless disregard for Brewer's rights and was certain, or reasonably could have been expected, to cause severe emotional distress to Brewer.

62.   Mountain State's actions and conduct directly and proximately caused Brewer to suffer emotional distress.

63.   Mountain State's actions and conduct caused Brewer to suffer emotional distress so severe that no reasonable person could be expected to endure it.

64.   As a direct and proximate result of Mountain State's intentional infliction of emotional distress upon Brewer, she has sustained various damages.

## COUNT VIII
## PUNITIVE DAMAGES

65.   Brewer incorporates by reference hereto paragraphs 1 through 64 as if set forth verbatim hereinafter.

66.   Mountain State engaged in conduct that was intentional, reckless, wanton, willful, and in total disregard for Brewer's rights.

67.   As a direct and proximate result of Mountain State's conduct, Brewer's is entitled to punitive damages.

**WHEREFORE**, Plaintiff Christy M. Brewer demands judgment against Defendant Mountain State University, Inc. for compensatory and punitive damages in amounts to be set by the Court or the jury; pre- and post-judgment

interest; attorney's fees; expenses, court costs; and any other relief the Court

deems just and proper.

**PLAINTIFF CHRISTY M. BREWER DEMANDS A TRIAL BY JURY**

**CHRISTY M. BREWER**
**By Counsel**

/s/ Jeffrey V. Mehalic
Jeffrey V. Mehalic (WV State Bar No. 2519)
Law Offices of Jeffrey V. Mehalic
P. O. Box 11133
2011 Quarrier Street
Charleston, WV 25339-1133
(304) 346-3462
jeff@mehaliclaw.com
*Counsel for Plaintiff Christy M . Brewer*