IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

**CHRISTY M. BREWER,**

    *Plaintiff,*

v.                                      **Civil Action No. 5:11-CV-0467**
                                                **Honorable Irene C. Berger**

**MOUNTAIN STATE UNIVERSITY, INC.,**

    *Defendant.*

### DEFENDANT MOUNTAIN STATE UNIVERSITY INC.'S
### MOTIONS *IN LIMINE*

Defendant Mountain State University, Inc. ("MSU") respectfully makes the following motions *in limine*:

### MOTION *IN LIMINE* NO. 1
*To exclude evidence that MSU gave Brewer the wrong grade in GCRNA 542, and also to exclude evidence that MSU denied Brewer the opportunity to appeal her grade in GCRNA 542.*

Upon information and belief, Plaintiff Christy Brewer, a former student in cohort 3 of MSU's Certified Registered Nurse Anesthetist ("CRNA") program, intends to present evidence that the former director of the CRNA program, Dr. Wayne Ellis, falsely told her that she had failed a course designated GCRNA 542, Advanced Pharmacology II. More specifically, MSU is informed and believed that Brewer intends to testify that, whereas Dr. Ellis told her in December 2007 that she had an average of 79.8% in the course, she actually had an average higher than 80%, which was the minimum average required to earn a passing grade.

When Dr. Ellis told Brewer that she had a failing average in GCRNA 542, he gave her a number of options, one of which was to withdraw from the course, and then re-take it the in the fall of 2008 with cohort 4. Brewer agreed to this option, and consequently her

transcript showed the letter "W" adjacent to GCRNA 542.[1] However, not long after agreeing to withdraw from the course, Brewer formed the belief that her 79.8% average was wrong, and she had actually passed the course.

Brewer retained an attorney, James Stebbins, to represent her in her dealings with MSU. Stebbins engaged in a long exchange of e-mail correspondence with Elma Reed, counsel for MSU, regarding Brewer's GCRNA 542 grade. On behalf of MSU, Reed offered to allow Brewer to appeal the grade, utilizing MSU's appeal procedure, even though deadline for appealing had long passed. (June 9, 2008, 9:55 a.m. e-mail from Elma Reed, MSU Associate General Counsel, to James Stebbins, attached as "Exhibit A;" excerpts from MSU's Graduate Student Handbook describing appeal procedure, attached as "Exhibit B"). Reed also explained that, in order to appeal her GCRNA grade, Brewer first had to agree to revoke her withdrawal, so that there would be a grade assigned which she could appeal. (July 15, 2008, 10:52 a.m. e-mail from Elma Reed to James Stebbins, attached as "Exhibit C"). After consulting with her attorney, Brewer decided that the risk of losing her appeal was too great, and so she decided not to appeal. Instead, she let the GCRNA 542 grade stand, and re-took the class the next fall with cohort 4.

Under the Graduate Nursing Program Student Handbook, students may appeal adverse decisions through a three-level appeals process. A student who wished to appeal a grade would meet with the faculty member who assigned the grade within five days of receiving the grade to present a written appeal with supporting documentation explaining its basis. Within five days of this meeting, the faculty member would deliver a written notice to the student, with a decision to either uphold or reverse the grade. The student could appeal this "Level One"

---

[1] Brewer was also withdrawn from three other fall, 2007 semester courses. MSU corrected Brewer's transcript in the summer of 2008 to show that she had earned passing grades in the three other courses. MSU's Motion *In Limine* No. 2 addresses this issue.

decision to "Level Two" within five days. This next level of appeal would go to the faculty member's Senior Academic Officer. If the student was still not satisfied with her grade, she could further appeal to "Level Three," the Academic Review Board: a body of five members, including three faculty members, one administrative staff member, and the President of the Student Government Association. (Ex. B).

MSU's appeals process is similar to that which the Supreme Court of Appeals applied in *Hoffman v. Grove*, wherein a student teacher was dismissed from the student teaching program due to performance issues. 171 W. Va. 720, 721-22, 301 S.E.2d 810, 810-11 (1983). When the student brought a mandamus action to compel his reinstatement, the West Virginia Supreme Court of Appeals denied the petition because the student had "an established grievance procedure that would provide him with an opportunity to obtain information as to the reason for the dismissal and to present his reasons for contesting it." *Id.* at 721, 301 S.E.2d at 811. Similarly, in *Brown v. State ex rel. State Bd. of Higher Educ.*, 711 N.W.2d 194 (N.D. 2006), the Supreme Court of North Dakota applied the exhaustion of administrative remedies doctrine to a dispute between a student and a university. *Id.* at 198. The court noted that "[w]hen appellate processes are available and the remedies will provide adequate relief, those remedies must be exhausted before seeking judicial remedies, unless exhaustion would be futile." *Id.* at 195 (citing *Tracy v. Central Cass Public School Dist.*, 574 N.W.2d 781 (N.D. 1998)). The court affirmed the dismissal of the student's claim regarding the revocation of his degree because the student failed to exhaust his administrative remedies under the university's policies. *Id.* at 199.

The reasoning employed in *Hoffman* and *Brown* applies with even greater force to Brewer. Not only did Brewer have the opportunity to timely appeal her grade, but after

Brewer retained James Stebbins, Elma Reed repeatedly extended additional opportunities for Brewer to appeal the grade, even though the normal appeal deadline had passed. (Exs. A, C; *see also,* July 28, 2008 2:35 p.m. e-mail from Elma Reed to James Stebbins, attached as "Exhibit D."). Fearing that her appeal might not succeed, Brewer chose to let the grade stand. ( June 9, 2008 e-mail from James Stebbins to Elma Reed, attached as "Exhibit E").

Brewer made an informed decision, with the advice of counsel, not to pursue available administrative remedies to appeal her GCRNA 542 grade. Now, nearly five years later, she wants to revisit the calculation of her grade. MSU will be prejudiced should Brewer be permitted to do this, because faculty members' memories of test grades and averages calculated so long ago are inevitably going to be less clear than they would have been had Brewer appealed. Brewer also appears poised to claim that she was denied her appeal right, when the record clearly shows otherwise. This argument would amount to an effort to imply that her GCRNA 542 grade was improper. Brewer should not be permitted to use a demonstrably false argument about her appeal rights to plant such a suggestion in jurors' minds. Therefore, MSU respectfully requests that this Court grant its motion *in limine* and enter an order precluding Brewer from introducing evidence about alleged errors in calculating her GCRNA 542 grade, and from introducing evidence that she was denied her right to appeal her GCRNA 542 grade.

**MOTION *IN LIMINE* NO. 2**
*To exclude evidence that MSU caused a one-year delay in Brewer's graduation.*

In the discussion of Motion *in limine* no. 1, MSU referred to the fact that Dr. Ellis gave Brewer a number of options. More specifically, he gave Brewer three options: (1) withdraw from the CRNA program; (2) re-take the final exam; or (3) withdraw from GCRNA

542 and re-take the course with cohort 4. (Deposition of Christy Brewer, pp. 55-56, attached as "Exhibit F"). As previously explained, Brewer rejected the premise that she had failed GCRNA 542. She could have appealed her grade but did not do so. A timely appeal could have rendered the three options moot. Instead, she chose option 1—to retake GCRNA 542 with cohort 4 the following year. Furthermore, in an e-mail to James Stebbins regarding negotiations with MSU, Brewer wrote that she wanted to achieve the following: (1) to have the grades for the fall 2007 courses which she passed added to her transcript; and, (2) to re-take GCRNA 542 in the fall of 2008 with cohort 4. (a copy of the June 9, 2008 e-mail to James Stebbins is attached as "Exhibit G").[2] MSU agreed to exactly the terms that Brewer was seeking. As discussed in detail in Motion *In Limine* No. 3, below, MSU corrected Brewer's transcript by substituting the appropriate letter grades for the "W's" appearing adjacent to the three fall 2007 semester courses she had passed, and MSU agreed to let Brewer re-take GCRNA 542 in the fall of 2008.

Despite the fact that she chose to re-take GCRNA 542, and that she obtained exactly what she was seeking through the efforts of her attorney James Stebbins, MSU is informed and believes that Brewer intends to present evidence that MSU breached it contract and committed fraud by compelling her to delay her graduation for one year by joining cohort 4. Brewer likely also will seek to present evidence of lost wages corresponding to a one-year delay of her entry into the CRNA profession. Such evidence would be contrary to Brewer's sworn testimony and the documentary record, and thus would tend to confuse jurors and unfairly prejudice MSU. Therefore, MSU respectfully requests that the Court order that Brewer be

---

[2] Brewer produced e-mails between herself and James Stebbins during discovery. Counsel inquired at Brewer's deposition whether the e-mails were inadvertently produced, and if so, offered to return them. The response given was that the e-mails were not inadvertently produced.

prohibited from introducing evidence or making arguments that MSU delayed her graduation by one year.

## MOTION *IN LIMINE* NO. 3
*To exclude evidence that MSU wrongly withdrew Brewer from classes which she had passed.*

Within a few days of the December, 2007 meeting between Dr. Wayne Ellis and Brewer described above, in which Brewer learned that she had failed GCRNA 542, as a follow-up to Brewer's decision to withdraw from and re-take GCRNA 542 in the fall of 2008, MSU sent Brewer written notices that she was being withdrawn from all four courses she took in the fall semester of 2007. Withdrawal from all four fall, 2007 courses, including those she had passed, was not what Brewer had intended. Brewer speculates that the blanket withdrawal from all of her fall 2007 courses was deliberate and evidences fraud. That makes no sense, however, in light of the fact that MSU promptly sent Brewer written withdrawal notices. Those notices directed Brewer to respond in writing to her instructor and to the registrar within ten days if she did not agree with the withdrawals. (copies of the notices are attached as "Exhibit H"). However, Brewer did not respond in writing to her instructors or to the registrar to indicate that the withdrawals were incorrect.

Instead of following the prescribed procedure, Brewer claims that she sent one e-mail to Dr. Wayne Ellis in January 2008. (Brewer Dep., Ex. F, pg. 68.) Brewer has not produced any such e-mail. According to Brewer, after getting no response from Dr. Ellis, she communicated only with the former Dean of the School of Health Sciences, Dr. Patsy Haslam. *Id.* Throughout the spring of 2008, Brewer exchanged e-mails with Dr. Haslam (who died in 2008 and thus did not give a deposition in this case) about a variety of issues relating to the CRNA program, but did not raise the issue of being improperly withdrawn from all her classes.

Instead, Brewer decided to wait until June 2008 to pursue that issue, with the assistance of her attorney, James Stebbins.

When James Stebbins brought the fact that Brewer had been withdrawn from all four fall 2007 classes to MSU's attention, MSU agreed to change Brewer's transcript to show the grades she earned in the courses she had passed in the fall of 2007. (Brewer Dep., Ex. F, pp.62-63; *see also,* grade change request forms, attached as "Exhibit I"). Thus, Brewer's complaints about being withdrawn from classes she had passed were resolved to her satisfaction through negotiations between James Stebbins and Elma Reed, Associate General Counsel for MSU, more than three years before she filed her Complaint. (Brewer Dep., Ex. F, pp .62-63; 100-101).

Upon information and belief, even though Brewer did not follow the procedure for notifying MSU of problems with withdrawals but waited to raise the issue, and even though Brewer's concerns about being withdrawn were resolved to her satisfaction in the summer of 2008 with the assistance of counsel, Brewer still intends to present evidence that she was wrongly withdrawn from the courses she passed in the fall semester of 2007. Given the facts set forth above, Brewer should not be permitted to confuse the jury by introducing evidence pertaining to this issue.

## MOTION *IN LIMINE* NO. 4
*To exclude evidence that Brewer lost job or educational opportunities at the University of Tennessee Medical Center*

After making the decision in December 2007 to withdraw from GCRNA 542 so that she could re-take it with cohort 4 in the fall of 2008, Brewer faced the question of what courses she should take in the interim. She agreed to enroll in GCRNA 699, "Special Topics." This was to be an individualized course tailored to address the problems which led Brewer to fail GCRNA 542, and also to keep her current on topics she would need to know when she joined

cohort 4. In addition, students seeking a CRNA degree were required by accrediting agencies and by the boards governing the CRNA profession to maintain continuity in their academic work. Hence, Brewer enrolled in GCRNA 699 for the spring 2008 semester, and again for the summer, 2008 semester.

Dr. Wayne Ellis was Brewer's instructor for GCRNA 699. He left the University late in the summer of 2008. As a consequence, Brewer did not receive a final grade for GCRNA 699 for that semester. In the absence of a final grade, Brewer's transcript automatically showed "WIP" (work in progress). MSU policy mandates that after a certain period of time, if a student has not completed a course and achieved a grade, a "WIP" on the student's transcript will automatically change to an "F." (July 26, 2010 4:57 p.m. e-mail from Dr. Shepperd to Brewer, attached as "Exhibit J").

After graduating from MSU's CRNA program, Brewer received a job offer from the University of Tennessee Medical Center ("UTMC"). (Ex. F, Brewer Dep. p. 105). As part of the job application process, Brewer requested that MSU send a copy of her transcripts to UTMC. Brewer did not realize that her "WIP" in GCRNA 699 had changed automatically to an "F." Moreover, with Dr. Ellis gone from the University, there was nothing to prompt MSU to realize that the "F" on the transcript should not be there, because in this case the problem was not the student's failure to complete her work; but rather, the instructor's departure before the course was scheduled to be finished. Thus, the transcript that MSU sent showed that Brewer had failed her GCRNA 669 course in the Summer 2008 semester. *Id.* at 105. When Brewer called the error to MSU's attention, MSU changed the "F" to a "W" and re-sent the transcript.

UTMC notified Brewer that they were withdrawing their job offer. *Id.* at 108. Upon information and belief, Brewer intends to introduce evidence that she lost her job opportunity at UTMC because MSU sent her transcript showing the "F" for GCRNA 699. Brewer should not be permitted to introduce such evidence. There are no UTMC witnesses who will testify to support Brewer's argument. Moreover, there are no UTMC documents that support her argument. To the contrary, UTMC documents show that UTMC based its decision on the fact that Brewer failed her first attempt at the CRNA licensure examination. Thus, an effort by Brewer to suggest that it was the erroneous transcript which caused her to lose her job would be worse than an invitation to jurors to engage in speculation, it would be an invitation to disregard the facts, which are:

--On July 26, 2010, Brewer told MSU about the error in her transcript. (July 26, 2010 2:48 p.m. e-mail from Brewer to Dr. Rhonda Shepperd, MSU Registrar, attached as "Exhibit K").

--Later that same day, July 26, 2010, MSU advised Brewer that it would send a revised transcript to UTMC. (Ex. J).

-- Despite MSU sending UTMC the erroneous transcript earlier, in a letter dated September 7, 2010, UTMC confirmed to Brewer that she still had an offer of employment. (September 7, 2010 letter from Pam Brichetto, UTMC Assistant Director of Human Resources, to Brewer, attached as "Exhibit L").

-- Brewer notified UTMC on August 30, 2010 that she had failed her boards. (August 30, 2010 e-mail from Brewer to James A. Jones, attached as "Exhibit M").

--It was two months after MSU sent UTMC the corrected transcript, and after Brewer had notified UTMC that she had failed her boards, that UTMC officials decided to rescind Brewer's employment offer. (October 7, 2010 e-mail from M. Paige Rinehart to Dana C. Whittle, attached as "Exhibit N").

--Finally, lest there be any doubt, UTMC stated that the reason that it rescinded Brewer's job offer on October 7, 2010 was, "Licensure not obtained." (University Health System Personnel Actions Form, dated October 22, 2010, attached as "Exhibit O").

Based on these facts, Brewer should be precluded from introducing evidence that MSU's sending of an erroneous transcript to UTMC cost her a job opportunity there.

### MOTION *IN LIMINE* NO. 5
*To exclude evidence of the CRNA program being placed on probation.*

Brewer graduated from Mountain State University's ("MSU") Certified Registered Nurse Anesthetist ("CNRA") program in July 2010, passed her licensing exam in October 2010, and is now employed in her field at a hospital in Nassawadox, Virginia, earning $140,000 annually with a full range of benefits. While she was a student in MSU's CRNA program, on December 3, 2007, Brewer wrote an e-mail to program director Dr. Wayne Ellis telling him that she had "no complaints" about the CRNA program and was "very satisfied" with it. (e-mail from Brewer to Dr. Wayne Ellis and Melody Tilley, attached as "Exhibit P"). She nevertheless appears poised to attempt to make an issue of the fact that the Council on Accreditation ("COA") placed MSU's CRNA program on probationary status in February 2009.

The COA did not revoke accreditation of the CRNA program. Rather, the probation was lifted on January 20, 2010. (a copy of COA's February 4, 2010 letter regarding its decision to take MSU off of probation is attached as "Exhibit Q"). Thus, the program never lost accreditation, and Brewer graduated from an accredited CRNA program. COA's accreditation action is therefore not relevant to her claims. Furthermore, efforts by Brewer to raise the issue of accreditation will be unduly prejudicial to MSU.

**MOTION *IN LIMINE* NO. 6**
*To exclude evidence about Dr. Smith's meeting with students in March 2009*

As previously stated, the essence of Brewer's claims against MSU is that MSU's actions delayed her graduation and entry into the job market for a year. For some inexplicable reason, Brewer includes in her Complaint allegations about an MSU professor, Dr. Ron Smith, launching into a tirade against certain CRNA students on or about March 18, 2009. (Compl. ¶ 21). This alleged incident, however, is never connected to any of Brewer's various causes of action. This is understandable, as the alleged incident did not relate to Brewer's failing grade in GCRNA 542, her withdrawal from the Fall 2007 classes, the subsequent delay in her graduation, or her job application at UTMC.

Consequently, the alleged outburst by Dr. Smith is not relevant to any of Brewer's claims and is therefore inadmissible under Rule 402. Furthermore, even if Brewer could somehow connect Smith's alleged diatribe to her claims, its minimal probative value would be more than outweighed by the danger that Smith's allegedly heated language could cause unfair prejudice to MSU, or that the evidence could confuse the jury as to the true issues in this case: whether MSU breached a contract with Brewer or committed fraud so as to delay Brewer's graduation for a year.

MSU therefore respectfully requests that the Court grant its motion *in limine* and enter an order precluding Brewer from introducing evidence or testimony regarding the March 2009 meeting between Dr. Smith and the CRNA students.

**MOTION *IN LIMINE* NO. 7**
*To exclude evidence or testimony regarding alleged educational malpractice by MSU*

Brewer alleges that MSU breached its contractual agreement to provide her an education by: (1) giving her a failing grade in GCRNA 542; (2) denying her the right to appeal

this failing grade; (3) withdrawing her from her Fall 2007 classes; and (4) placing a failing grade on her transcripts for a class from which she had withdrawn. (Compl ¶¶ 36, 40). Brewer cites these same allegations as support for her claims of fraud (Compl. ¶ 43), negligence (Compl. ¶ 49), intentional misrepresentation (Compl. ¶ 52), and negligent misrepresentation (Compl. ¶ 56). Despite her attempts to characterize these claims otherwise, Brewer is actually alleging educational malpractice on MSU's part. Because courts across the country do not recognize educational malpractice claims, Brewer should not be permitted to introduce evidence of these actions by MSU in support of any of her claims.

While not yet addressed in West Virginia, "[t]he great weight of authority generally holds that the law recognizes no cause of action for 'educational malpractice,' either in tort or contract, by a student against a private educational institution asserting inadequate or improper instruction." *Bittle v. Oklahoma City University*, 6 P.3d 509, 514 (Okla. Civ. App. 2000) (citing *Regents of the University of Michigan v. Ewing*, 474 U.S. 214, 225 (1985); *Swidryk v. St. Michael's Medical Ctr.*, 493 A.2d 641 (N.J. Super. 1985); *Paladino v. Adelphi University*, 454 N.Y.S.2d 868 (1982)); *see also Ross v. Creighton University*, 957 F.2d 410, 414 n.2, 416-17 (7th Cir. 1992) (holding that a student cannot repackage an educational malpractice claim as a breach of contract claim where the student merely alleges that the school failed to provide an effective education). "The courts uniformly reason that such a claim runs afoul of established public policy which both accords educational institutions broad discretion in matters purely academic, particularly in the evaluation of student performance, and directs judicial non-interference in decisions within that discretion." *Id.*

In a factually similar case, the Minnesota Court of Appeals recently found that when a graduate student alleged that a university breached its contract with her by requiring her to take additional courses before it would allow her to register for her final project seminar, the claim was essentially an educational malpractice claim, which should be dismissed. *Zinter v. Univ. of Minn.*, 799 N.W.2d 243, 246 (Minn. Ct. App. 2011). Quoting the "well-reasoned" opinion of the trial court, the court in *Zinter* noted that determining breach of contract claims in the educational context would require the fact finder to delve into the nuances of the school's educational processes and theories, something that courts are not equipped to do. *Id.*

Similarly, determining whether the decision to withdraw Brewer from her Fall 2007 classes and switch her from cohort 3 to cohort 4 based on her failing grade in GCRNA 542 would require an inquiry into MSU's educational judgment and decision-making. Courts universally recognize that this is not a proper function of the judiciary. *See Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 90 (1978) ("Like the decision of an individual professor as to the proper grade for a student in his course, the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking.")

Accordingly, MSU respectfully requests that the Court grant its motion *in limine* and enter an order precluding Brewer from introducing evidence or testimony of any alleged educational malpractice by MSU to support her claims.

**MOTION *IN LIMINE* NO. 8**
*To exclude evidence regarding damages for any delay of Brewer's career between August 2010 and October 2010*

Brewer claims that MSU caused a delay of one year in her graduation and subsequent employment as a CRNA. But after her graduation from MSU, Brewer herself

contributed to her delayed entry into the job market. Brewer failed her CRNA board exams the first time she took them in August 2010. (Ex. F, Brewer Dep. pp. 12-13). It follows that her inability to gain employment as a CRNA between August 31, 2010, when she failed the boards, and October 14, 2010, when she passed the boards, cannot be attributed to MSU.

Consequently, MSU respectfully requests that the Court grant its motion *in limine* and enter an order excluding evidence or testimony of any claimed damages between August 31, 2010 and October 14, 2010.

**MOTION *IN LIMINE* NO. 9**
*To exclude evidence regarding allegations that MSU required Brewer to enroll in GCRNA 699 for fraudulent reasons*

Following her meeting with Dr. Ellis on December 12, 2007, when she was informed of her failing grade in GCRNA 542 and offered several options as a result, Brewer chose to revert from Cohort 3 to Cohort 4 and engage in a course of independent study until Cohort 4 began the classes she had already taken. (Letter from Brewer to Dr. Wayne Ellis (Dec. 13, 2007), attached as "Exhibit R"). This choice was Brewer's, and she participated in designing her course of study for the Special Topics classes she would take while waiting for Cohort 4. *Id.* Brewer thus cannot claim that her decision to enroll in Special Topics 669 for the Spring and Summer semesters of 2008 are based on any fraudulent conduct by MSU.

MSU therefore respectfully requests that the Court grant its motion *in limine* and enter an order precluding any evidence or testimony that Brewer's decision to enroll in Special Topics 669 in the Spring and Summer 2008 semesters can serve as a basis for a fraud claim against MSU.

# MOTION *IN LIMINE* NO. 10
*To exclude testimony that MSU promised to assign Brewer clinical rotations that were close to her home.*

Brewer claims that various officials at MSU verbally promised her that her clinical rotations would be to locations within fifty miles of her home, yet her actual clinical rotations were to various hospitals in West Virginia, Kentucky, and Maryland. (Compl. ¶ 22). But there is no evidence that anyone at MSU ever made such a specific promise to Brewer. Brewer claims that Dr. Ellis and Melody Tilley both promised her that she could do her clinical rotations within fifty miles of her home (Brewer Dep., Ex. F, pp. 24-25, 29). Ellis and Tilley, however, both deny ever making this promise. (Melody Tilley Dep., pg. 31, attached as "Exhibit S"; Ellis Dep. pp. 156-57, attached as "Exhibit T"). In fact, the course advertising materials provided to students by MSU state, "One of the goals of the program is to keep the student as close to home as possible for clinical experience. However, some relocation may be needed to accommodate the requirements of the Council on Accreditation of Nurse Anesthesia Educational Programs and Council on Certification of Nurse Anesthetists." (Nurse Anesthesia Program flyer, attached as "Exhibit U"). The Student Handbook only states, "Student assignments to clinical sites will be within the individual's immediate geographical area *when possible*. The Nurse Anesthesia faculty has the responsibility to identify, obtain, and develop the clinical sites with the support of practitioners and administrators within the clinical sites." (MSU Student Handbook 22, attached as "Exhibit V") (emphasis added). Although Dr. Ellis verbally reiterated this goal to Brewer, he expressed it as such—a "goal" or "intention." (Ellis Dep., Ex. T, pg. 157). There was always a qualification, expressed in both the written materials and Dr. Ellis's verbal statements, that students might have to travel to wherever clinical experiences were available. *Id.* Brewer has no evidence to support her belief that she was promised clinical

rotations within fifty miles of her home. MSU's statement that student clinical assignments would be within the student's immediate area when possible was only an aspirational goal and does not have the level of specificity required to serve as a basis for a breach of contract claim. *Younker v. Eastern Associated Coal Corp.*, 214 W. Va. 696, 701, 591 S.E.2d 254, 259 (2003). Any testimony to the contrary would tend to confuse the jurors and should therefore be excluded.

Consequently, MSU respectfully requests that the Court grant its motion *in limine* and enter an order prohibiting Brewer from introducing any testimony that MSU made a contractual promise to assign her clinical rotations that were within fifty miles of her home.

Dated this, the 30th day of July, 2012.

**By Counsel**

| | |
|---|---|
| | /s/ John R. Merinar, Jr. |
| | John R. Merinar, Jr. (WV ID #6080) |
| | jack.merinar@steptoe-johnson.com |
| | Jeffrey M. Cropp (WV ID # 8030) |
| STEPTOE & JOHNSON PLLC | jeffrey.cropp@steptoe-johnson.com |
| Of Counsel | 400 White Oaks Boulevard |
| | Bridgeport, WV 26330 |
| | (304) 933-8000 |
| | |
| | *Attorneys for Defendant* |
| | *Mountain State University, Inc.* |

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

**CHRISTY M. BREWER,**

    *Plaintiff,*

v.

                                                **Civil Action No. 5:11-CV-0467**
                                                **Honorable Irene C. Berger**

**MOUNTAIN STATE UNIVERSITY, INC.,**

    *Defendant.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of July, 2012, I filed the "Defendant Mountain State University Inc.'s Motions *in Limine*" with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

                                  Jeffrey V. Mehalic, Esq.
                                  LAW OFFICES OF JEFFREY V. MEHALIC
                                  P.O. Box 11133
                                  Charleston, WV 25339-1133
                                  jeff@mehaliclaw.com

|  |  |
|---|---|
| | /s/ John R. Merinar, Jr. |
| | John R. Merinar, Jr. (WV ID #6080) |
| | Jeffrey M. Cropp (WV ID #8030) |
| STEPTOE & JOHNSON PLLC | 400 White Oaks Boulevard |
|     OF COUNSEL | Bridgeport, WV 26330 |
| | (304) 933-8000 |
| | *Counsel for Defendant* |
| | *Mountain State University, Inc.* |