# EXHIBIT A

**From:** Elma Reed
**Sent:** Monday, June 09, 2008 9:55 AM
**To:** jstebbins@stebbinsandpinkerton.com
**Subject:** C. Brewer

Dear Mr. Stebbins,

Attached is a copy of the appeals procedure in the current MSU student handbook.  As we discussed this morning, MSU is allowing Ms. Brewer an extension to file her appeal and, per the appeals procedure, may file directly at level two with Dr. Patsy Haslam, Dean of School of Health Sciences and Nursing.  To expedite the procedure, Ms. Brewer may fax her appeal to Dr. Haslam at 304-929-1600 or e-mail to phaslam@mountainstate.edu.  It is my understanding that Dr. Haslam has some documentation on this matter, but Ms. Brewer may include any additional information she believes would be helpful.

Thank you for your help in this matter.

Sincerely,

Elma

Elma M. Reed, J.D.
Associate General Counsel
Mountain State University
P.O. Box 9003
Beckley, WV  25802-9003
(304) 929-1324

NOTICE OF CONFIDENTIALITY:
This communication constitutes an electronic communication within the meaning of the Electronic Communications Privacy Act, 18 U.S.C. Section 2510, and its disclosure is strictly limited to the recipient intended by the sender of this message. This email transmission and any documents, files, or previous email messages attached to it may contain CONFIDENTIAL information that is legally PRIVILEGED. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, any disclosure, copying, distribution, or use of any of the information in this transmission is strictly prohibited. If you have received this transmission in error, please notify us immediately by reply email and by telephone at (304) 929-1324, and destroy the original transmission and its attachments without reading, printing, distributing, or saving in any manner. Thank you.

MSU 00158

# EXHIBIT B

# Mountain State University™

*MSN Nurse Anesthesia Student Handbook*

## Appeals Process

### Complaint Resolution

Individual who concerns or complaints have related to any of the program concentrations addressed in the Graduate Nursing Program Student Handbook should refer to the following web site: (http://www.mountainstate.edu/current/policies/default.aspx)

### Professional Conduct

Every student enrolled at Mountain State University shall conduct himself/herself in accordance with the mission and goals of the University. Such conduct includes, without limitation, maintaining integrity and honesty in educational pursuits, respecting the rights and privileges of others, and upholding the laws of the State of West Virginia and the United States of America. It is the responsibility of the student to educate him/herself and abide by all University policies and procedures related to students, including all program policies and procedures, all classroom requirements, all housing policies and procedures, all library policies and procedures, all lab policies and procedures, and all other policies and procedures of the University. The University reserves the right to modify any policies and procedures as necessary to further its mission of higher education and will give reasonable notice to students of changes.

### Charges regarding Academic Integrity:

Faculty and staff members may complete an incident report concerning any student who is suspected of a breach of academic integrity (e.g., cheating, plagiarism, etc.). The faculty or staff member will investigate the matter and may appropriately institute sanctions against the student in furtherance of the mission and goals of Mountain State University. Students may appeal any decision made under this policy by following the appeal procedure detailed below. All students will, in good faith, cooperate in any investigation. Sanctions may include, without limitation, verbal reprimands, written reprimands, professional probation, disciplinary probation, restitution, social probation, counseling, dismissal from a class, community service, mandatory referral for treatment or evaluation, suspension or dismissal from a program, suspension from the University, and probation or suspension from financial aid participation. Only the President may expel a student from Mountain State University. Be aware that some charges involving academic integrity may include charges of misconduct which may also be reported to the Dean of Students and Campus Life.

### Charges of Misconduct or Behavioral Issues:

Any person may file a complaint with Mountain State University regarding the behavior or conduct of any student. This is accomplished by completing an incident report and forwarding it to the Dean of Students and Campus Life. The Dean of Students and Campus Life will investigate the matter and may appropriately institute sanctions against the student in furtherance of the mission and goals of Mountain State University. All students will, in good faith, cooperate in any investigation. Sanctions may include,

MSU - Brewer 01423

# ◢ Mountain State University™

### *MSN Nurse Anesthesia Student Handbook*

without limitation, verbal reprimands, written reprimands, professional probation, disciplinary probation, restitution, social probation, counseling, dismissal from a class, community service, mandatory referral for treatment or evaluation, suspension or dismissal from a program, suspension from the University, and probation or suspension from financial aid participation. Only the President may expel a student from Mountain State University. Be aware that some charges involving conduct or behavioral issues may include charges of academic integrity which may also be reported to the staff of the student's program of study.

## Appeal Procedures (Including Grade Appeals)

Any student may utilize these appeal procedures to challenge the following University actions only: a final course grade of D or F, professional probation, disciplinary probation, restitution, social probation, counseling, dismissal from a class, community service, mandatory referral for treatment or evaluation, suspension or dismissal from a program, suspension from the University, probation or suspension from financial aid participation removal of the student from University housing, restrictions on the student regarding his/her physical presence on campus, and/or revocation of a student privilege (e.g., computer use, activity attendance, etc.). *Note: Disciplinary Appeals are limited on the following bases: failure on the University's part to follow its' established processes; new pertinent information not available at the time sanctions were issued; and the student feels sanctions were too harsh.* A student may challenge such University action using the following appeal procedures:

- **Level One.** Within five (5) days following the student's notice of the action, the student shall meet with the initiating faculty or staff member or the Dean of Students and Campus Life (whichever individual made the decision and/or initiated the sanction). The student should present at this meeting a written appeal with supporting documentation (if any) explaining the basis of the appeal. The faculty/staff member or the Dean of Students and Campus Life will, within five (5) days following the meeting, deliver to the student written notice that the initial sanction is either upheld or reversed, in whole or in part. If the student is unable to resolve the matter at this level, or if this discussion would be impossible or futile, the student may appeal the decision in accordance with Level Two.

- **Level Two.** Within five (5) days following the receipt of the appeal decision as outlined in Level One, or in the event that the student's meeting with the University employee in Level One would be impossible or futile, the student may, by certified mail, deliver a complete written appeal to the faculty/staff member's Senior Academic Officer (regarding grade appeals or charges of academic integrity) or the Campus Provost (for all other issues) The student's appeal must provide adequate factual allegations and appropriate accompanying documentation to support the grievance of the student. Upon receipt of a timely appeal from the student, the supervising academic officer for the program or the Campus Provost (as appropriate) shall investigate the matter and may within his/her discretion require from any University employee additional documentation necessary to fairly evaluate the student grievance. Upon review and investigation of the appeal, the

**MSU - Brewer 01424**

# ⚙ Mountain State University™

*MSN Nurse Anesthesia Student Handbook*

initial sanction may be either upheld or reversed, in whole or in part. The hearing officer shall provide written notification outlining his/her decision to the student and the faculty member or administrator within ten (10) days of the timely receipt of the student's appeal.

- **Level Three.** Within five (5) days following notice of the Level Three decision, the student may, by certified mail, deliver a complete written appeal to the Chair of the Academic Review Board. The appeal must provide adequate factual allegations and appropriate accompanying documentation to support the appeal. Upon receipt of a timely appeal, the Chair of the Academic Review Board will convene a meeting to determine if the student has provided sufficient evidence to review the appeal. If the Academic Review Board determines that there is not enough evidence to conduct a review, then the Level Two decision will be upheld. If the Academic Review Board determines that the student has provided sufficient evidence to review the appeal, the Academic Review Board shall investigate the matter and may require from any faculty or staff additional documentation necessary to fairly evaluate the appeal. The Academic Review Board may uphold the Level Two decision, reverse the Level Two decision in whole or in part, or may make further changes deemed appropriate to further the University's mission. The Chair of the Academic Review Board shall notify all parties in writing within ten (10) days after receipt of the appeal of the decision.

The decision of the Academic Review Board is final, except that the President of Mountain State University may, within his/her discretion, reverse or modify the decision of the Academic Review Board as necessary to further the mission of the University.

The Academic Review Board is an academic entity comprised of 5 (five) members. Three members shall be from the University faculty (one being the Chair) and appointed by the University President. One member shall be a University administrative staff member appointed by the University President. One member shall be the President of the MSU Student Government Association. A minimum of three members of the Board (including the Chair) must be present to render decisions or administer appeals.

Any petition filed in accordance with this paragraph shall be mailed, certified, addressed as follows:

PETITION FOR ACADEMIC REVIEW
Office of the President
Mountain State University
Box 9003
Beckley WV 25802-9003

**MSU - Brewer 01425**

# ⚂ Mountain State University™

*MSN Nurse Anesthesia Student Handbook*

## Notice Regarding Time Limits

Administrators at each appeal level may extend the time limits stated in these procedures as appropriate to provide a fair and thorough review and resolution of the student grievance.

## Legal Intervention

Any correspondence from a student's attorney to the University shall be addressed to Mountain State University, General Counsel, Box 9003, Beckley WV 25802-9003. The relevant Senior Academic Officer may at his/her discretion postpone and/or reinitiate the appeals process as he/she deems appropriate in the event that the student seeks formal legal intervention.

## University Appeal Process Flow Chart



MSU - Brewer 01426

# EXHIBIT C

**From:** Elma Reed
**Sent:** Tuesday, July 15, 2008 10:52 AM
**To:** James Stebbins
**Cc:** Christy Brewer
**Subject:** RE: Christy Brewer

Please understand that this is not an appeal hearing; at this point, there is nothing to appeal. Ms. Brewer chose to be withdrawn from the class; she cannot appeal her own decision. This meeting will be to clarify her test grades. After this meeting, if Ms. Brewer decides she would like the WP she currently has on her transcript changed to an F, I will recommend that she be allowed to do so. At that point, she can appeal the grade. Dr. Ellis is the first level of appeal. I do not believe it would be appropriate for him to be in any meeting prior the appeal process.

I suggested this meeting so that a determination could be made regarding Ms. Brewer's test scores and the resultant final class grade. If you can show me that my calculations are wrong and that Ms. Brewer passed the class based on her current scores including the hand graded test scores, I will be happy to talk to Dr. Ellis about changing the WP on her transcript to a passing grade. If not, it will be up to Ms. Brewer to determine whether some of her test answers that were marked wrong should be accepted as correct and whether any possible changes in her test scores would result in a passing class grade. If she believes this would be the case, I will recommend that her grade be changed to and F, and she can appeal that grade.

I do not believe it would be in your client's best interest to make a decision about changing the notation on her transcript until she is sure of her current grade. If the current notation is changed to an F because she decides that she wants to appeal, it will not be changed back should her appeal be denied.

Elma M. Reed, J.D.
Associate General Counsel
Mountain State University
P.O. Box 9003
Beckley, WV  25802-9003
(304) 929-1324

NOTICE OF CONFIDENTIALITY:
This communication constitutes an electronic communication within the meaning of the Electronic Communications Privacy Act, 18 U.S.C. Section 2510, and its disclosure is strictly limited to the recipient intended by the sender of this message. This email transmission and any documents, files, or previous email messages attached to it may contain CONFIDENTIAL information that is legally PRIVILEGED. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, any disclosure, copying, distribution, or use of any of the information in this transmission is strictly prohibited. If you have received this transmission in error, please notify us immediately by reply email and by telephone at (304) 929-1324, and destroy the original transmission and its attachments without reading, printing, distributing, or saving in any manner. Thank you.

# EXHIBIT D

**From:** Elma Reed
**Sent:** Monday, July 28, 2008 2:35 PM
**To:** James Stebbins
**Cc:** Shawna Pinkerton
**Subject:** christy brewer

Mr. Stebbins,

If you are sure of your calculations concerning Ms. Brewer's grade for CRNA 542, I see no reason for us to meet. Ms. Brewer can accept her original decision to withdraw from the class and retake it in the fall, or she can request that she be allowed to rescind that decision and have the WP changed to an F so that she can appeal her grade. Keeping in mind that the F will remain on her transcript if her appeal fails, I will once again explain why I believe your determination is flawed.

The original scores I was given by the department were:

Aug 24th 64; Sept 14th 65; Oct 5th 83; Oct 26th 70; Nov 16th 60; Dec 7th 81 Corr. 40; Lab 100

Keep in mind, these are points awarded, not percentage grades.

Because I did not see the scantron results for the last test (Dec 7) in the copy of her file I received, I asked that the test be graded by hand according to the test key. Re-grading resulted in a score of 105 instead of 81. Replacing the 81 with 105 in the formula, Ms. Brewer was very close to passing. Those were the scores I sent you, not as her final scores, but so you would have the formula Dr. Ellis used to determine a final grade when you received copies of her tests. I explained this in a telephone conversation and informed you that, because we were now aware there was a problem with the scantron, we would be grading all of her tests by hand. We also discussed at that time that while one score increased, others could be lowered. I recognized that when they were all re-graded there was a possibility she might end up with a passing grade. Unfortunately, that was not the case. When all of the tests were re-graded by hand, there was very little difference in the outcome. Her hand-graded scores were:

62+73+70+61+61+105+40+100

Again, these are not percentage scores; the 105 is 105 correct out of 150 possible, or 70%

After receiving copies of the hand-graded tests, you used only the hand-graded score for Dec. 7th, which raised her score considerably. For the rest of her scores, you continued to use the incorrect scores as determined by the scantron. You then eliminated the score for Aug 24th claiming that it was from the previous semester and dropped out the correlation score, which was only a 40, for which you gave no reason. I may have confused you by calling that score a lab score (that was my understanding until I was able to talk to Dr. Ellis last Friday), but that doesn't explain why you believed it should have been disregarded. Below are the calculations you used and sent to me by e-mail on June 24th.

65 + 83 + 70 + 60 + 105 + 100

As you can see from your calculations above, the "62" for Aug 24th is missing; the "83", "70", and "60" are from her original scantron grades, which are not the grades on the tests you were sent; the "105" is a hand-graded score; and you have omitted the "40" corr. score.

I explained in an e-mail sent to you on July 7th that the date of 8/24/07 on the test and on Ms. Brewer's scantron, which she personally dated, fell within the fall semester; the semester in which she took CRNA 542. As you can see from the attached documents, the Summer I semester, in which she took CRNA 540, ended on August 9, 2007; the Fall semester, in which she took CRNA 542, started on August 20, 2007. Because both the date of the test and date entered on the scantron sheet by Ms. Brewer were 8-24-07, I believe it is safe to say that the test occurred during the Fall semester of 2007 and was for CRNA 542 and not CRNA 540; the notation of 540 on the test was in error.

If you are using some method other than Dr. Ellis's formula to determine Ms. Brewer's grade, please explain it to me so that we can evaluate its merit. I hope this information is helpful.

MSU 00216

# EXHIBIT E

**From:** James Stebbins [mailto:JStebbins@stebbinsandpinkerton.com]
**Sent:** Monday, June 09, 2008 1:28 PM
**To:** Elma Reed
**Cc:** Christy Brewer; Patsy Haslam
**Subject:** RE: C. Brewer

*Elma:*

*I have spoken to my client and she is interested in pursuing the appeal process for whatever it is worth. However, she is legitimately concerned that she may end up in a worse position than she is now if the grade is appealed, the failing grade upheld, and that grade posted. As things stand now, she made an administrative withdrawal from that class prior to posting and does not have a failing grade on her permanent record. Please assure us that appealing this will not result in a failing grade on her permanent record no matter what happens so that we can be comfortable in pursuing the appeal. Thanks.*

*James C. Stebbins*
*STEBBINS & PINKERTON, P.L.L.C.*
*P. O. Box 11652*
*Charleston, WV 25339*
*304-345-6111*
*FAX: 304-345-6110*
*E-mail address: jstebbins@stebbinsandpinkerton.com*

CONFIDENTIALITY NOTE: This e-mail and any attachments are confidential and may be protected by legal privilege. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of this e-mail or any attachment is prohibited. If you have received this e-mail in error, please notify us immediately by returning it to the sender and delete this copy from your system. Thank you for your cooperation.

**MSU 00162**

# EXHIBIT F

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY


CHRISTY M. BREWER,
            Plaintiff,

       v.                      CIVIL ACTION NO. 5-11-0467

MOUNTAIN STATE
UNIVERSITY, INC.,
            Defendant.


       The deposition of CHRISTY M. BREWER, a party

in the above-entitled cause, taken before Dana M. Pon,

Notary Public in and for the Commonwealth of Virginia

at Large, at the Municipal Building, 2 Plum Street,

Cape Charles, Virginia on April 23, 2012, commencing

at or about the hour of 12:00 p.m.



APPEARANCES:   FOR THE PLAINTIFF:
               Law Offices of Jeffrey V. Mehalic
               BY:  JEFFREY V. MEHALIC, ESQUIRE
               1215 Quarrier Street
               Post Office Box 11133
               Charleston, West Virginia  25330

               FOR THE DEFENDANT:
               Steptoe & Johnson PLLC
               BY:  JOHN R. MERINAR, JR., ESQUIRE
               400 White Oaks Boulevard
               Bridgeport, West Virginia  26330



Christy M. Brewer                                    April 23, 2012

12

1    job.

2          Q        Does your husband work?

3          A        No.

4          Q        Do you own a home here?

5          A        No.

6          Q        Do you rent a home here?

7          A        Yes.

8          Q        Let me ask you about your board exam, and

9    I'm in need of a little education here.  Do you have

10   to take a separate board exam for each state in which

11   you're licensed, or is there one exam which is common

12   to those states?

13         A        No.  It's one exam.

14         Q        What is it called?

15         A        It's through NBCRNA.

16         Q        Okay.  And I know I asked this once, but

17   when did you take that exam?

18         A        I've taken that exam twice.

19         Q        Okay.  What -- when did you take it?

20   What --

21         A        I took it August 31st of 2010.

22         Q        Uh-huh.

23         A        I took it a second time October 14th of

24   2010.

25         Q        Did you pass it the first time?



13

1        A        Obviously not.

2        Q        The second time you did?

3        A        Yes, sir.

4        Q        When you did not pass it the first time,

5    did you get scores which would let you know how far

6    from the passing grade you were?

7        A        Scores?

8        Q        In other words, did you just know if you

9    passed or failed or did they actually give you a score

10   so you could see how close you were?

11       A        I got a -- it's a breakdown.  I can't

12   remember the scores.

13       Q        Uh-huh.

14       A        But it's a breakdown.  It tells you by --

15   I won't say subject, but category.

16       Q        Do you remember what categories you had

17   problems with the first time?

18       A        No, sir.

19       Q        Did you do anything between the first exam

20   and the second to prepare yourself?

21       A        Obviously, I did.

22       Q        What was that?

23       A        I made a different study plan for the

24   second time that I took the boards.

25       Q        Was this individual study or group study?



Christy M. Brewer                                    April 23, 2012

24

1    conversations with Ann Bostic, Linda Williams, or

2    Wayne Ellis before you started as a student?

3           A       No, not that I recall.

4           Q       So Melody was your main contact.  Were

5    your communications with her primarily verbal or were

6    they by some other means primarily?

7           A       Both verbal and e-mail.

8           Q       Okay.

9           A       In the beginning mostly verbal.

10          Q       Okay.  Can you remember today anything

11   Melody Tilley told you before you started as a student

12   that you thought from your perspective was misleading,

13   inaccurate, unfair, anything of that nature?

14          A       Yes.

15          Q       Okay.  What things did she tell you that

16   fall in those categories?

17          A       I specifically asked about the clinical

18   assignments.  One reason I looked at Mountain State

19   and applied there was the way they had set up their

20   program.  You could remain at home with your family,

21   attend classes, and attend clinicals within a

22   fifty-mile radius of your home.

23          Q       All right.  Now, what did Melody say about

24   that?

25          A       She verified those things.



Christy M. Brewer                                    April 23, 2012

25

1     Q       When you -- when you say verified, that

2 suggests to me you must have read it somewhere.  Is

3 that -- and then she commented in some way; is that

4 accurate?

5     A       They had a -- Mountain State had a packet,

6 a prospective student packet.

7     Q       All right.

8     A       I don't remember, sir, if it was printed

9 or if it was verbal; but it was highly communicated

10 that those things I stated were accurate.

11    Q       So you remember Melody saying to you that

12 you could live at home and attend clinicals within

13 fifty miles of your home --

14    A       Yes, sir.

15    Q       -- is that accurate?  And did she tell you

16 that once?  More than once?  Do you remember?

17    A       Several times.

18    Q       Okay.  Would this have been phone

19 conversations or in person?

20    A       Phone conversation.

21    Q       Do you remember whether or not she ever

22 wrote that down for you in an e-mail?

23    A       I don't remember.

24    Q       Okay.  Now, if this happened several

25 times, how did that come about?  Was it because you



Nationwide Scheduling
Toll Free:    1.800.337.6638
Facsimile:   1.973.355.3094
www.deponet.com

Christy M. Brewer                                April 23, 2012

29

1    is before -- let's include orientation in it.   Okay?

2          A       Yes, sir.

3          Q       We're including orientation in this

4    question.   Did anybody who was a faculty member or

5    administrator say something to you that you now

6    believe to have been misleading, inaccurate, or

7    unfair?

8          A       Yes, sir.

9          Q       Okay.   Now, you've told me about Melody;

10   so I want to set that aside.   I already know about

11   that.   What else?

12         A       I believe Wayne Ellis was misleading

13   during the interview because he reiterated the things

14   that Melody had said in regard to the travel, the

15   clinicals.   He also reiterated that again in December

16   when I attended orientation.

17         Q       Okay.   All right.   Anything else?

18         A       Not that I can recall at this time, sir.

19         Q       And is it accurate to say that the reason

20   you believe that what Melody told you and what Wayne

21   Ellis told you was in some way inaccurate, unfair, or

22   misleading is because later on when you did your

23   clinicals you had to travel well beyond fifty miles

24   from your home?

25         A       Yes.



Christy M. Brewer                                    April 23, 2012

55

1          A          I was devastated.  I was simply

2     devastated.  Here I had put my trust in Dr. Ellis,

3     constantly going to him, asking him could I please see

4     these exams, could I please have a syllabi, could he

5     please assist me in a study plan.  Anything that he

6     could provide for me I would have gladly accepted.  I

7     cried.  No.  I sobbed in his office for quite a while.

8     I collected myself, and I again asked him how he came

9     up with a grade of 79.8.

10         Q          And did he tell you --

11         A          He could not defend where that grade come

12    from.  He continued on to explain my options at this

13    point in time with the program and the university.

14         Q          What did he tell you those options were?

15         A          Those options, sir, are clearly documented

16    in the letter or some form of documentation that I

17    have supplied for you.

18         Q          Okay.  Do you remember today what he told

19    you?

20         A          I'll do my best.  One option was that I

21    could withdraw from the program and join the nurse

22    practitioner program.  A second option was that I

23    could retake the final exam.

24         Q          Uh-huh.

25         A          I don't remember the third, sir.  You will



Nationwide Scheduling
Toll Free:     1.800.337.6638
Facsimile:   1.973.355.3094
www.deponet.com

Christy M. Brewer                                    April 23, 2012

56

1    have to look at my notes.

2          Q        Was the third option to join Cohort 4 and

3    retake the course?

4          A        I believe so, yes.

5          Q        Okay.  And isn't it true that that's the

6    option you selected, joining Cohort 4?

7          A        It was the ethical option, sir.

8          Q        What do you mean by the ethical option?

9          A        I did not feel that it was ethical to

10   repeat a final exam.

11         Q        Dr. Ellis -- well, when he told you you

12   could retake the final exam, didn't you think, well,

13   if you had a 79.8 average, all it would take would be

14   to do just a little bit better on the final and you

15   could achieve the 80 percent you needed and keep with

16   Cohort 3?  Did that thought cross your mind?

17         A        It was a tempting thought, sir; but it

18   would have been wrong because this option that he was

19   offering me was to be done in secret and in private.

20         Q        Did Dr. Ellis explain why or what his

21   reasoning was for allowing you to retake the exam?

22         A        No.

23         Q        Had you decided not to withdraw and join

24   the nurse practitioner program, is there some reason

25   why that was an unappealing option to you?



Christy M. Brewer                                    April 23, 2012

62

1          down -- like down here.

2                      THE WITNESS:  Oh.

3

4    BY MR. MERINAR:

5          Q       Let me -- I'll -- I believe those are

6    grade change requests to change the grades that you

7    received in GCRNA 536, 602, and 610 from WP to the

8    appropriate letter grade, whether it be A or B.  And I

9    believe that was done in June of 2006 -- or, rather,

10   2008.  My purpose in showing you those is to ask you

11   whether or not seeing those forms that your memory is

12   refreshed and you agree that those are, indeed,

13   corresponding to the time when your grades were

14   changed.

15         A       I -- yes.  And I have to retract.  I

16   believe this is the first time I've ever seen these.

17         Q       All right.  Do you recall in the summer of

18   2008 your grades were changed from WP to either A or B

19   in the three courses that you passed in the fall of

20   2008?

21         A       I'm sorry.  State it again, please.

22         Q       Do you recall that in the summer of

23   2008 --

24         A       Uh-huh.

25         Q       -- your grades for the courses that you



Christy M. Brewer                                      April 23, 2012

63

1    passed in the fall of 2007 were changed from WP to the

2    appropriate letter grade, whether it be A or B?

3         A       Yes, you are correct.

4         Q       Now, when you left the meeting in -- with

5    Dr. Ellis on December 12th of 2007 -- well, I'm sorry.

6    Strike that.

7                When you wrote back to Dr. Ellis on

8    December 13th, 2007, did you intend to convey that you

9    were going to withdraw from your courses for the fall

10   semester 2007?

11        A       No.  Absolutely no.

12        Q       At any point did you understand that you

13   were going to be withdrawing from your courses?

14        A       No.

15        Q       What did you think was going to happen

16   with GCRNA 542, the course that he told you you had

17   failed?

18        A       I understood from that meeting on December

19   12th that I would be withdrawn from 542 only.

20        Q       But not from the other courses, correct?

21        A       Correct.

22                MR. MERINAR:   Okay.  Let's have this

23         marked as Exhibit 5.

24                (Brewer Exhibit Number 5 was marked for

25         identification.)



Christy M. Brewer                                    April 23, 2012

68

1      Q      Well, let me go back, then.  The way that

2    you contested the withdrawal from all the classes as

3    opposed to withdrawing just from 542 was first

4    communicated with Dr. Ellis and when that didn't work

5    to go to Dr. Haslam; is that correct?

6      A      Yes.

7      Q      And I've seen e-mails that looked like you

8    had some ongoing communication with Dr. Haslam

9    throughout the spring of 2008.  Do you remember that

10   as being accurate?

11     A      Yes.

12     Q      Do you remember telling Dr. Haslam that

13   with regard to the issue you were pursuing, you would

14   prefer to wait until after June when the council for

15   accreditation visit had been concluded?

16     A      I did make that decision based on her

17   recommendation.

18     Q      Let's see here.  Is that recommendation

19   Dr. Haslam made to you in person, by telephone, or by

20   e-mail, if you recall?

21     A      In person.

22     Q      What did she tell you about waiting that

23   you can recall?

24     A      She told me that she felt it would be best

25   for me and for the university to just hold on, not



**DepoNet**

Nationwide Scheduling
Toll Free:    1.800.337.6638
Facsimile:   1.973.355.3094
www.deponet.com

Christy M. Brewer

April 23, 2012

100

1      Mr. Stebbins that you had the opportunity to appeal?

2           A      Yes.  However, I do believe that

3      communication was incorrect.  I was not able to

4      actually appeal because there was no F.  I believe

5      that was the end result of these e-mails.

6           Q      Did Mr. Stebbins share the content of that

7      e-mail that you have before you with you?

8           A      I believe so, yes.

9           Q      All right.  Let me show you --

10                 MR. MERINAR:  Now let's have this marked

11          as 15.

12                 (Brewer Exhibit Number 15 was marked for

13          identification.)

14

15     BY MR. MERINAR:

16          Q      It appears to be an e-mail to you from

17     James Stebbins dated June 9th, 2008, correct?

18          A      Yes.

19          Q      And in that e-mail you list things that

20     you are seeking to accomplish or obtain; is that

21     correct?

22          A      Let me read it, sir, first.

23                 All right.  Continue.

24          Q      Okay.  You write, So, with all that being

25     said, here is what I would like (please advise if



Christy M. Brewer                                April 23, 2012

101

1    these are good decisions).  And, number one, you

2    write, I would like the 3 grades that I earned for

3    530, 610 and 602 posted on my official transcript.  Do

4    you see that?

5         A       Yes.

6         Q       Isn't it true that MSU posted the three

7    grades that you had earned for 530, 610, and 602 on

8    your transcript?

9         A       They did post them.

10        Q       You also write, I would like to repeat the

11   542 Pharm class.  Is it true that you did repeat the

12   542 Pharm class?

13        A       Yes.

14                MR. MERINAR:  All right.  Now let's have

15        this marked as 16.

16                (Brewer Exhibit Number 16 was marked for

17        identification.)

18

19   BY MR. MERINAR:

20        Q       16 appears to be a grade scoring sheet of

21   some sort, and I think it's got your handwriting on

22   the bottom.  Am I correct about that?

23        A       Uh-huh.  Yes.

24        Q       And it says, Grades as provided by?

25        A       That's Wayne E. Ellis.


**DEPONET**

Nationwide Scheduling
Toll Free:    1.800.337.6638
Facsimile:   1.973.355.3094
www.deponet.com

Christy M. Brewer                                       April 23, 2012

105

1    sure you can clear it for me -- you asked that a

2    transcript be sent to the University of Tennessee

3    Medical Center.   Do you recall that?

4          A      That was after graduation.

5          Q      And what was your intent at the University

6    of Tennessee Medical Center?

7          A      I was being credentialed.

8          Q      For what purpose?

9          A      Through the credentialing department there

10   at the University of Tennessee, I had received an

11   employment contract from the University of Tennessee.

12   And before you start working at any hospital, there's

13   a process called credentialing that you go through.

14         Q      And the employment contract, was that to

15   be for work as a CRNA?

16         A      Yes.

17         Q      And I understand that at one point MSU

18   sent a transcript to the University of Tennessee

19   Medical Center that showed an F for GCRNA 699 in the

20   summer semester of 2008; is that correct?

21         A      I don't know which class, but there was an

22   F on the transcript that they mailed.

23         Q      All right.   And then you communicated with

24   MSU and asked them to change that; is that also

25   correct?



Nationwide Scheduling
Toll Free:    1.800.337.6638
Facsimile:    1.973.355.3094
www.deponet.com

Christy M. Brewer                                    April 23, 2012

107

 1     credentialing department that I would contact the

 2     university and I was sorry for the first transcript.

 3              Q      And after the university received the

 4     second revised transcript, what, if anything, was said

 5     to you about this issue?

 6              A      Just that it was resolved.

 7              Q      Now, did you have a signed -- well, did

 8     you have an agreement with the University of Tennessee

 9     Medical Center to begin work as a CRNA upon receiving

10     your license?

11              A      Yes.

12              Q      And how much were you to be paid pursuant

13     to that agreement?

14              A      I don't recall.

15              Q      Was it a written agreement?

16              A      Yes.

17              Q      Do you have a copy of it somewhere?

18              A      Maybe.

19              Q      Okay.  Do you remember whether or not you

20     were to be paid substantially more or substantially

21     less than you're making at Riverside?

22              A      I don't remember.

23              Q      Did the transcript have anything to do

24     with the fact that you're not working at the

25     University of Tennessee Medical Center, to your



Christy M. Brewer

April 23, 2012

108

1    knowledge?

2        A       I personally feel that it does.

3        Q       Okay.  Were you -- was it your decision

4    not to work there, or did they simply contact you and

5    tell you they no longer were interested?

6        A       It was not my decision.

7        Q       Okay.  How was their decision communicated

8    to you?

9        A       By telephone.

10       Q       And what were you told on the telephone?

11       A       I was told that I would not be starting

12   there.  They were sorry.  Best of luck to me.  Good

13   luck in finding a new job.

14       Q       Did they tell you why?

15       A       They did not mention the transcript

16   incident.

17       Q       Did the phone call that you received come

18   at a point in time where you were reasonably sure they

19   had received the revised transcript?

20       A       Yes.

21       Q       And you know -- I'm sorry.  You didn't --

22   you said you don't recall the people who you dealt

23   with there?

24       A       The credentialing department.  I'm not

25   sure their official titles or the names of the women



Nationwide Scheduling
Toll Free:    1.800.337.6638
Facsimile:   1.973.355.3094
www.deponet.com